UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

Case No.:

-----------------------------------------------------------------------X

MARCELLA BROWN, Individually, and as Proposed Administratrix of The Estate of KEVIN C. BROWN, Deceased

Plaintiff,

-against-

COUNTY OF NASSAU, NASSAU COUNTY CORRECTIONAL CENTER, NASSAU COUNTY SHERRIF'S DEPARTMENT, MICHAEL J. SPOSATO, Individually, and as Sherriff of Nassau County, ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., NASSAU COUNTY CORRECTIONS OFFICERS, "JOHN DOES 1-10," in their Individual and Official Capacities, ARMOR CORRECTIONAL HEALTH SERVICES, INC. EMPLOYEES and AGENTS, "JOHN And JANE DOES 11-20," in their Individual and Official Capacities,

Defendants.

-----------------------------------------------------------------------X

VERIFIED COMPLAINT

JURY TRIAL DEMANDED

Plaintiffs, by their attorneys, DELL & DEAN, PLLC, for their Verified Complaint against the Defendants, allege as follows:

1) This is an action that arises out of the needless, shameful, and preventable death of KEVIN C. BROWN (hereinafter, "BROWN") while he was an inmate in the care and custody of the COUNTY OF NASSAU (hereinafter, the "County"), the NASSAU COUNTY SHERIFF'S DEPARTMENT (hereinafter, the "NCSD"), MICHAEL J. SPOSATO, Individually, and as Sheriff of Nassau County, the staff of the NASSAU COUNTY CORRECTIONAL CENTER (hereinafter, the "NCCC"), and in the health and medical care of the staff of ARMOR CORRECTIONAL HEALTH SERVICES, INC., ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., NASSAU COUNTY CORRECTIONS OFFICERS, "JOHN

DOES 1-10," in their Individual and Official Capacities, ARMOR CORRECTIONAL HEALTH SERVICES, INC. EMPLOYEES and AGENTS, "JOHN and JANE DOES 11-20," in their Individual and Official Capacities, (hereinafter collectively, "Armor"), during BROWN's detention at the NCCC.

2) At all relevant times herein, it was the duty and the obligation of Defendants to administer to the health needs of and to medically tend to and treat the inmates of the NCCC. It was the duty of Defendants to care for, protect, and insure the welfare of the inmates of NCCC.

3) Armor had entered into a contract with the County to provide health services and medical treatment for the inmates of the NCCC, which contract was (and is) in full force and effect at all relevant times herein, including the present time.

4) BROWN was denied competent, necessary, medical care by the Defendants. The pleas of BROWN, and BROWN's fellow inmates, who plainly could apprehend that he was experiencing a very serious and severe medical incident that required immediate medical attention, care, and treatment by an experienced and competent physician, were ignored by Defendants.

5) Plaintiff seeks redress against the Defendants for their intentional, unconstitutional, reckless, and otherwise tortious conduct and for the deliberate indifference exhibited by these Defendants, including, without limitation, of the policies, customs, practices, protocols, training of personnel, supervision of personnel, due process, and the Defendants' inhumane treatment of BROWN, which deprived him of necessary medical attention, his constitutional rights, and his life.

6) Defendants had and have known about the deficient, incompetent, unprofessional, and negligent healthcare and medical treatment of inmates at the NCCC for years, and had the

opportunity to but failed to make reasonable and effective efforts to remedy the situation and provide inmates with medical treatment within the accepted standards of medical practice.

7) There was a long and pervasive history of deficient health and medical care at the NCCC so as to establish a pattern of deficient health and medical care, establishing Defendants' actual notice of same.

8) This practice of deficient, negligent, health and medical care established, constituted, and furthered the policies, practices, and customs of the Defendants, in violation of all statutes alleged herein.

9) The Defendants' allowance of such policies, practices, and customs to come into existence, and to continue and persevere constituted deliberate indifference on the part of the Defendants.

10) The significant pattern of similar violations of health and medical care at the NCCC signified an additional need to train and supervise.

11) The County, NCSD, NCCC and the Sheriff (hereinafter collectively referred to as the "municipal defendants") failed to train and supervise or to adequately train and to adequately supervise NCCC staff, including corrections officers and medical staff, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including BROWN.

12) There was an obvious need for such training to avoid the violation of BROWN's constitutional rights, and the Defendants failed to correct the situation.

13) There was a pattern of similar constitutional violations by untrained or improperly trained employees and agents of the Defendants.

14) Defendants inadequate training caused the deprivation of BROWN's constitutional rights and all other violations of law herein.

15) Defendants failed to establish a policy or practice that would protect BROWN against deficient health and medical care.

16) Armor failed to train and to supervise, or to adequately train and to adequately supervise the employees and agents of the other Defendants, amounting to deliberate indifference to the constitutional rights of NCCC inmates, including BROWN. The medical care, training, and supervision provided by Armor constituted a deviation from accepted standards of medical care in the geographical area encompassing Nassau County.

17) There was a pattern of similar constitutional violations by untrained or improperly trained employees, agents, or subcontractors of Defendants at the NCCC. Defendants failed to establish a policy, custom, or practice that would protect BROWN against deficient health and medical care.

18) The inadequate training mentioned herein constituted a cause of BROWN's violations of constitutional rights and injuries alleged herein.

19) In contravention of their duty and obligation to provide proper health and medical care services for inmates at NCCC, and in violation of the constitutional rights of inmate BROWN, the Defendants ignored the specific findings and recommendations relating to specific deficiencies and failures at the NCCC, at all relevant times herein, of the New York State Commission of Correction, a lawful and duly constituted agency of the State of New York, tasked with the duty to investigate and oversee the care provided by correctional and holding facilities within the State.

20) Defendants' deficiencies, incompetence, medical negligence, medical malpractice, and acts and omissions caused the wrongful death of BROWN.

21) Following the death of inmate BROWN, Defendants knowingly and fraudulently withheld information from MARCELLA BROWN and BROWN's entire family. Defendants acted in a concerted and fraudulent manner to prevent MARCELLA BROWN and BROWN's entire family from becoming aware of their conduct, omissions and actions as well as the identity of the outsourced third-party medical care providers, the cause of BROWN's injuries and BROWN's death.

22) Defendants fraudulently concealed the fact that an investigation was commenced into the cause of BROWN's death, and that the findings were issued in a report. MARCELLA BROWN and BROWN's entire family's first notice that something untoward occurred was a call from an investigative reporter in or about November 2015.

23) The nature of the claim is for intentional infliction of emotional distress, severe and permanent pain and suffering; severe personal injuries sustained by decedent, negligent and wrongful death of BROWN and all other damages allowed by statute and case law as a result of the fraud, carelessness, negligence, carelessness, gross negligence, medical malpractice, willful conduct and intentional conduct of the Defendants, their agents, servants, deputies, and/or employees and other affiliates agencies and departments, without any contributory negligence on the part of the Claimant, in causing violations of 42 U.S.C. § 1983, 42 U.S.C. § 1988, 42 U.S.C. § 1981, 42 U.S.C. § 1985, the Eighth Amendment of the United States Constitution, the Fourteenth Amendment of the United State Constitution, Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), 29 U.S.C.S. § 794, and violations of the New York State Constitution as well as all areas of state and federal common and/or case law.

## JURISDICTION AND VENUE

24) The within action is authorized by and brought pursuant to the laws of the United States, including 42 U.S.C. § 1983, 42 U.S.C. § 1988, 42 U.S.C. § 1981, 42 U.S.C. § 1985, the Eighth Amendment of the United States Constitution, the Fourteenth Amendment of the United State Constitution, Title II of the Americans with Disabilities Act (42 U.S.C. § 12132), and 29 U.S.C.S. § 794, and the Constitution of the State of New York.

25) The Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) and has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202. This Court may grant injunctive relief as authorized by 28 U.S.C. §§ 2283 and 2284, and Rule 65 of the Federal Rules of Civil Procedure.

26) Plaintiffs further invoke the supplemental jurisdiction of this Court to adjudicate pendent state law claims pursuant to 28 U.S.C. § 1367.

27) Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b)(2) because it is where the events giving rise to this action occurred.

## PARTIES

28) Plaintiff MARCELLA BROWN is the natural mother of BROWN and lives in Nassau County, New York, in the Eastern District of New York. Procedures have been initiated to have MARCELLA BROWN appointed as Administratrix of the Estate of KEVIN C. BROWN, deceased.

29) Defendant COUNTY OF NASSAU, a municipal corporation, is a political subdivision of the State of New York. The COUNTY OF NASSAU is vicariously liable for and has ultimate responsibility for the NASSAU COUNTY CORRECTIONS CENTER, which is operated by the NASSAU COUNTY SHERIFF'S DEPARTMENT.

30) Defendant NASSAU COUNTY CORRECTIONS CENTER is located in East Meadow, New York, in the Eastern District of New York. The NCCC is a correctional facility, operated by the NCSD pursuant to Article XX of the Nassau County Charter.

31) Defendant, NASSAU COUNTY SHERIFF'S DEPARTMENT is a department of the Defendant County. It is headed by a Sheriff, who is its chief supervisor and administrator. The Sheriff, among other duties, oversees the operations of the NCSD, which includes the daily operation of the NCCC. The Sheriff is responsible for supervising deputy sheriffs, corrections officers, and other staff, and he participates in formulating and establishing the practices, customs, and policies, of his department and the NCCC, as well as overseeing those practices, customs, and policies.

32) Defendant MICHAEL J. SPOSATO, is at all relevant times, the Sheriff of the NCSD.

33) Defendant ARMOR CORRECTIONAL HEALTH SERVICES, INC. is a domestic corporation, foreign corporation, or other legal entity duly organized and existing under and by virtue of the laws of the State of New York.

34) Defendant ARMOR CORRECTIONAL HEALTH SERVICES OF NEW YORK, INC., is a domestic corporation, foreign corporation, or other legal entity duly organized and existing under and by virtue of the laws of the State of New York.

35) Defendants "Armor" (as herein defined) has contracted with the County, NCCC, and/or the NCSD to provide health and medical services to the inmates of NCCC. It assumed this function in place of the Nassau University Medial Center ("NUMC"), although use is to be made of the facilities and staff of the NUMC as needed.

36) Armor is responsible for creating, implementing, and enforcing policies, practices, customs, guidelines, and protocols applicable to its duty and obligation to provide health and medical services to inmates of the NCCC.

37) Armor was, at all relevant times herein, endowed by the County, NCCC, and/or NCSD with powers and functions that are governmental in nature so that Armor became an agency or instrumentality of the County, NCCC and/or the NCSD, and, therefore, operated under color of state law, and was subject to all obligations, constraints, and/or limitations, of the United States Constitution, New York State Constitution, the County, the NCCC, and/or the NCSD.

38) Defendants "John Does 1-10" are Corrections Officers, who were or still are employees, servants, and agents of the County, performing duties and services, including roles as supervisors, at the NCCC at all relevant times herein. Their names are unknown to the Plaintiff at this time but are known to the Defendants. With respect to the acts and omissions set forth in this Complaint, the Correction Officer Defendants, including supervisory Defendants, each acted under color of state law in the course of his/her duties and functions as an employee, servant, and/or agent of the County and was subject to all obligations, constraints, and/or limitations, of the United States Constitution, New York State Constitution, the County, the NCCC, and/or the NCSD.

39) Defendants "John and Jane Does 11-20" are employees, servants, agents, or independent contractors for Armor, who performed duties and services, including as supervisors, at the NCCC at the relevant times herein. These Defendants include physicians, nurses, physician's assistants, nurse practitioners, and other providers of health care to the inmates, including BROWN, at NCCC. Their names are unknown at this time but are known to the Defendants. With respect to the acts and omissions set forth in this Complaint, the aforesaid

Defendants, including supervisory Defendants, each acted under color of state law as agents of the County, NCCC, and/or NCSD, and was subject to all obligations, constraints, limitations, of the United States Constitution, New York State Constitution, the County, the NCCC, and/or the NCSD.

40) Each Defendant is liable, vicariously or otherwise, for the acts of each other Defendant herein.

**NOTICE OF CLAIM**

41) Following the death of inmate BROWN, Defendants knowingly and fraudulently withheld information from MARCELLA BROWN and BROWN's entire family. Defendants acted in a concerted and fraudulent manner to prevent MARCELLA BROWN and BROWN's entire family from becoming aware of their conduct, omissions and actions as well as the identity of the outsourced third-party medical care providers, the cause of BROWN's injuries and BROWN's death.

42) Defendants fraudulently concealed the fact that an investigation was commenced into the cause of BROWN's death, and that the findings were issued in a report. MARCELLA BROWN and BROWN's entire family's first notice that something untoward occurred was a call from an investigative reporter in or about November 2015.

43) As alleged in the Notice of Claim and pending petition, it is the Defendants' intentional, fraudulent concealment of the wrongdoing surrounding BROWN's death herein that lead to any purported delay in the filing of the Notice of Claim.

44) As such, Plaintiff should be afforded the benefit of all applicable relief including, but not limited to, equitable extensions of statutory prerequisite time limitations, equitable estoppel, and any other relief pursuant to any law or statute that would permit Plaintiff to

interpose all allowable claims against the Defendants pursuant to New York State and Federal law.

45) Procedures have been initiated to have MARCELLA BROWN appointed as Administratrix of the Estate of KEVIN C. BROWN, deceased. The Notice of Claim will be filed immediately upon such appointment.

## SUMMARY OF FACTS

46) Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

47) The County, NCSD, and NCCC share a long and disturbing history of neglect of their duties, obligations, and responsibilities with regard to the health and medical needs, and the general well-being of those who become inmates of the NCCC. The failures to provide appropriate health and medical treatment at the NCCC have been legion, and, all too often, inmates' detentions become death sentences.

48) The County, NCSD, and the NCCC knew of, or should have known, and neglected the pattern of deficient, unprofessional, incompetent, reckless, negligent, callous, and inhuman treatment of NCCC inmates with regard to the health and medical services rendered therein. Despite warnings, advisements, reprimand, censures, and orders from various Courts and State and Federal entities over the years, The County, NCSD, and NCCC have failed to provide the inmates of NCCC, including BROWN, with medical care that meets the standards of accepted medical practice, and the obligations, constraints, limitations, and requirements of the United States Constitution and the New York State Constitution.

49) The events, occurrences, and omissions leading up to the death of BROWN, while incarcerated in the custody of the County, the NCCC, the NCSD, Armor, and all other

Defendants, involve a long history of the County, the NCSD, and the NCCC failing provide inmates with medical care that meets the standards of accepted medical practice, and the obligations, constraints, limitations, and requirements of the United States Constitution and the New York State Constitution.

50) In or about 1981, then Nassau County Sheriff and the County entered into a consent judgment with inmate plaintiffs, who had filed suit complaining of the unconstitutional conditions at NCCC, including the insufficient medical services, at the NCCC.

51) Thereafter, the County, NCSD, and other Defendants refused to comply with the terms of the consent judgment. Thereafter, NCCC inmates brought a series of lawsuits against the NCCC, the County and the NCSD.

52) In or about 1999, the United States Department of Justice (hereinafter, "DOJ") conducted an investigation into the conditions of the NCCC, concluding that the conditions at the NCCC rose to the level of constitutional violations due to the deliberate indifference to inmates' serious medical needs.

53) The DOJ found that the NCCC failed to train and adequately supervise correctional staff, provided medical care by unlicensed and untrained staff, failed to ensure that inmates in need of routine or acute medical care were seen by medical staff in a timely manner, failed to ensure that inmates with chronic diseases receive timely and appropriate follow-up treatment or medication, failed to identify, monitor and treat communicable diseases and failed to adequately manage medication and medical records.

54) In or about 2002, the United States Attorney for the Eastern District of New York and the United States Attorney General's Office filed a lawsuit against the NCCC, the County, and the NCSD, over similar acts and omissions as mentioned herein. Following this lawsuit, the

United States DOJ and Nassau County entered into a consent decree ("Settlement") that directed the County and the NCCC to make significant changes to its policies and practices pertaining to, among other things, medical and mental health care. As a result of the Settlement, the DOJ monitored the NCCC until 2008.

55) Pursuant to the Settlement, the NCCC was required to cause to be developed and/or implemented appropriate medical policies, procedures, and protocols, which must conform to Standards of the New York State Commission on Correction Health Care ("NYSCCHC") and the American Psychiatric Association Standards for Psychiatric Services in jails and prisons.

56) In or about 2009, the New York State Commission of Correction ("NYSCOC") issued a report indicating that the NCCC was not in compliance with the minimum standards for a correctional facility. Addressing certain health and medical care needs of inmates was part of the twenty-five (25) steps that the NYSCCHC recommended that the NCCC would need to take to come into compliance with minimum standards.

57) The NYSCOC is an executive branch agency established to "visit and inspect…all institutions used for the detention of sane adults charged with or convicted of crime." The organization, powers, and duties of the NYSCOC are prescribed in Article 3 of the Correction Law. Among other things, the Commission is charged with "making recommendations to administrators of correctional facilities for improving the administration of such correctional facilities and the delivery of services therein" and "promulgating rules and regulations establishing minimum standards for the review of the construction or improvement of correctional facilities and the care, custody, correction, treatment, supervision, discipline, and other correctional programs for all persons confined in correctional facilities." (Correction Law §

45(2), (6)). While the NYSCOC is authorized to prescribe rules and regulations governing correctional facilities, the NYSCOC's authority to enforce such rules and regulations is limited.

58) In or about 1990, the County attempted to address some of the human rights issues at the NCCC by amending the County Charter and establishing a Nassau County Correctional Center Board of Visitors (§ 2004). This Board of Visitors was to have wide-ranging powers to oversee operations at the NCCC, including authority to investigate inmate grievances, inspect the facility, examine records, create reports and advise the Sheriff's Department about changes that could improve the facility and prevent unnecessary deaths.

59) The County Charter's provision mandating a Board of Visitors is a non-discretionary duty of the County. Yet, numerous County administrations failed to appoint the seven required Board members. In or about 2012, the New York Civil Liberties Union brought an action on behalf of NCCC inmates who suffered health and medical mistreatment and malpractice while incarcerated to compel appointment of the seven Board of Visitors members. The complaints ranged from inaccurate and/or improper administration of medication, untreated broken bones, and utter neglect and failure to provide a physician's examination despite extended periods of complaints of hearing loss and pain. A New York State Supreme Court Justice ordered the appointments of Board members in March of 2013. After much delay, upon information and belief, board members only recently were nominated and, eventually, their appointments were confirmed by the Nassau County Legislature.

60) Upon information and belief, the aforesaid Board of Visitors has not convened to address the health and medical needs of inmates at the NCCC.

61) Since 2010, at least, nine (9) inmates, whose deaths could have been prevented, have perished while incarcerated at the NCCC.

62) On January 3, 2010, while incarcerated at the jail, Eamin McGinn, 32, committed suicide. The NYSCOC reported that his was "a preventable death with inadequate provision of mental and medical health care."

63) On October 5, 2010, Gasparino Godino, 31, hanged himself while in detention at NCCC. The NYSCOC found this was preventable had he had proper health and medical care. Godino was a known suicide risk because of his long history of depression and drug use.

64) On October 27, 2010, Herve Jeanot, 29, committed suicide while incarcerated at the NCCC. He had been convicted of first-degree murder at his third-retrial. In its report on Jeanot's death, NYSCOC noted the NCCC "does not have any procedure in place for screening inmates who have been convicted at trial or who have received significant sentences of incarceration for suicide risk.

65) On January 3, 2011, Darryl Woody, 44, committed suicide. The NYSCOC found that the death of Woody may have been prevented but for the grossly inadequate psychiatric care provided him in the jail and NUMC and the lack of supervision. The NYSCOC further reported that Woody had a long history of mental instability and previously had attempted suicide on multiple occasions while at NCCC. The NYSCOC's report recommended investigations into the NCCC's booking, supervision, and staffing procedure and into the "gross negligence and incompetence" of the two doctors who treated Woody.

66) On June 11, 2011, Roy C. Nordstrom, 47, died of cardiac arrest. He complained of chest pains, eventually went to the infirmary and was sent back to his cell. He continued to complain of chest pain and difficulty breathing. Fellow inmates became aware of the serious distress that Nordstrom was in and shouted for guards to help Nordstrom, but to no avail.

67) Nordstrom had been incarcerated for violation of an order of protection and was due to be released eight days later. On June 11, at approximately 6:00am, Nordstrom was helped by two fellow inmates, clutching his chest, as he approached a guard's station. He was in obvious pain, distress, and had difficulty breathing. The guard called for medical care, however, no physician was contacted by anyone.

68) An unsupervised licensed practical nurse (LPN) diagnosed and treated Nordstrom, and he was sent back to his cell. While being escorted back to his cell, Nordstrom again notified the guard's of his unmitigated chest pain. He was taken back to the infirmary. Again, he was sent back to his cell. Thereafter, he was observed again to have serious chest pain. Eventually, an ambulance was called, and Nordstrom died shortly thereafter.

69) The NYSCOC report on the Nordstrom case indicated that he died of myocardial infarction while in the custody of NCCC and NCSD. The NYSCOC found that the death may have been prevented had Nordstrom received appropriate emergency medical care.

70) The NYSCOC also found that Armor was grossly incompetent and in violation of NYS Education Law, Article 139 (Nursing) in that treatment of Nordstrom constituted unprofessional conduct and that the unsupervised LPN acted outside his scope of practice.

71) The NYSCOC found, too, that by returning Nordstrom to his cell, the LPN abandoned the patient. It was found that Nordstrom should have been transferred to a hospital and treated by a physician. This failure constituted grossly inadequate and negligent medical care.

72) The NYSCOC report recommended that the Nassau County Executive "shall conduct" an inquiry into the fitness of Armor, Armor's flagrant disregard of the New York State

Education Law and the Rules of the Board of Regents, Armor's nursing practices, and Armor's unlawful medical practice.

73) On Febraury 24, 2012, Bartholomew Ryan hanged himself in his cell at the NCCC within 24 hours of his arrest. The 32-year-old Iraq War veteran had been arrested for driving under the influence of drugs and speeding. There is presently a lawsuit pending in the Eastern District of New York against the County of Nassau, the NCCC, the NCSD, Armor, and various corrections officers alleging civil right violations and wrongful death. The NYSCOC investigation into the death of Ryan found that Armor's care was inadequate.

74) Armor's track record for providing health and medical services beyond Nassau County is severely deficient, and the County, NCCC, NCSD, knew, or should have known, them to be inadequate medical health care providers. Numerous law suits across many different states were pending at the time the original contract was signed. In addition, news media outlets brought to light many of the issues with Armor's track record prior to the signing of the contract with the County.

75) Despite this track record, the County entered into a contract, negotiated by various County officials, with Armor on May 14, 2011, and Armor began performing medical services at NCCC on June 1, 2011. Public relations press releases by County officials touted a projected $7,000,000.00 annual savings by the County using armor rather than continuing to hire its own medical staff and using the NUMC.

76) In addition, the County renewed its contract with Armor, twice, in June 2013 and June 2015, despite the numerous deaths under Armor's and Defendants' care, custody and supervision.

77) Armor is known to have contracts with other correctional facilities, even within New York State, and there exist numerous similar occurrences of egregious preventable deaths while in the custody, care, and supervision of Armor.

78) In response to such preventable deaths, the Hillsborough County Sheriff's Office, as one example, terminated its relationship with Armor following the revelation of their inadequate medical care. Defendants herein, including the County, NCCC, and NCSD have instead renewed Armor's contract multiple times.

79) More than 10,000 people per year spend time in the NCCC awaiting trial, transfer, or are serving sentences for minor crimes. Quality of health care is being sacrificed, in violation of the United States and New York State Constitutions, for a population that is powerless while in the custody of the prison system. Due to their involuntary confinement, the NCCC inmates are vulnerable to abuse, as they are only allowed to receive the level of medical and health care that Defendants herein opt to give them.

**PLAINTIFF-DECEDENT KEVIN C. BROWN**

80) Plaintiffs hereby repeat, reiterate, and reallege each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

81) KEVIN C. BROWN ("BROWN") Plaintiff's decedent in the instant matter, was arrested on January 13, 2014, allegedly on an outstanding warrant for a minor crime and was incarcerated at the NCCC. On February 10, 2013, BROWN, age 47, was found dead in his cell.

82) BROWN's family reported that he had a history of seizures since suffering head trauma in an automobile accident approximately 20 years ago. He took medication to control the seizures.

83) The NYSCOC, which investigated BROWN's death, found that Brown died of heart failure due to hypertensive cardiovascular disease and that his body was in full *rigor mortis* when found, indicating that BROWN had been neglected and not checked by jail personnel for an extended, unreasonable, period of time.

84) The NYSCOC also found that Armor's care was deficient and resulted in a mismanaged mental health diagnosis, inadequate psychiatric care, undiagnosed heart problems, and inadequate management of a seizure disorder.

85) These findings were based, in part, on BROWN not being assessed by a doctor and not being considered for transfer to a hospital despite experiencing an earlier seizure at the NCCC, and on BROWN never receiving a full mental health assessment despite his suffering active hallucinations and agitated behavior upon admission to the NCCC.

86) According to the NYSCOC, the aforesaid deficiencies were compounded by a health record that was unorganized, incomplete, and illegible.

87) The NYSCOC concluded that, "Had BROWN received proper medical care and supervision, his death may have been prevented," and directed that Nassau County's Legislature inquire into Armor's fitness to provide inmate medical services. This directive was based on the findings in the Brown case and on what the NYSCOC termed as Armor's pattern of failing to provide hospitalization for patients who needed it, failing to properly manage patients' chronic medical needs and failing to keep proper and organized patient records.

88) The denial of appropriate medical care, neglect of BROWN's complaints, and inadequacy of the medical and psychiatric evaluations of BROWN, constituted deliberate indifference, cruel and unusual punishment, negligence, medical malpractice, carelessness,

recklessness, gross negligence, fraudulent and intentional conduct, rising to the level of violations of the United States and New York State Constitutions.

89) The NYSCOC, via numerous reports, warned the Defendants prior to BROWN's death, that they should and must address the deficiencies, failures, and other problems relating to health care and medical services at the NCCC.

90) The Defendants ignored the warnings and recommendations of the NYSCOC.

91) Based on the well-known, long and repetitious history of systematic medical and health care deficiencies and failures at the NCCC, as well as an abundance of adverse media coverage and publicity in that regard, a number of adverse NYSCOC reports, especially in the past approximately five years, the successful lawsuits brought against Defendants herein, and many hundreds of prisoner complaints, the Defendants had actual knowledge of the deficiencies in health and medical care at NCCC.

92) The Defendants knew of the deficiencies in the medical treatment of BROWN and/or the state of medical and health services at the NCCC could and would lead to the deadly consequences suffered by BROWN. They were aware of facts from which the interference could be drawn that a substantial risk of serious injury or harm existed with regard to BROWN.

93) The Defendants further exhibited deliberate indifference by ignoring past sanctions imposed by Courts and the DOJ, by allowing the systematic deficiencies imposed by Courts and the DOJ, by allowing the systematic deficiencies of health and medical care at the NCCC to "fester" for decades, by ignoring reports of the NYSCOC issued prior to that entities report on BROWN, by ignoring BROWN's condition, in failing to provide treatment for a diagnosed or known condition, by failing to investigate to make an informed judgment, by delaying treatment to BROWN, by failure to hospitalize BROWN, in making medical decisions

based on non-medical considerations, such as financial considerations, expediency, lack of staff, etc.), in interfering with access to medical treatment, in failing to hire efficient and/or sufficient personnel in connection with the daily maintenance and running of said facility; in failing to train or properly supply the staff with the tools, knowledge and equipment to care for all of the inmates; in failing to properly and/or adequately provide guidance for BROWN; in failing to monitor, supervise and/or safeguard BROWN properly on the day of the incident; in failing to respond to BROWN's calls for help; in failing to properly take precautions that there were no unreasonable calls for assistance; in failing to insure that BROWN as well as others had a safe and proper environment in which to be confined; in failing to prevent said incident; in failing to render medical care in accordance with the accepted standards of medical practice in the geographic region encompassing Nassau County; in failing to heed BROWN's complaints; in failing to diagnose BROWN's condition; in that defendants deviated from good and accepted medical methods, practice and procedures that said treatment fell below the standard of care in the medical community in that they, among other things, failed to use ordinary and reasonable medical care, diligence and skill, and failed to possess the requisite degree of learning, knowledge and skill as Defendants failed to diagnose BROWN's condition; in failing to do proper differential diagnosis; in failing to provide or recommend indicated medications to control, counteract, and/or alleviate BROWN's symptoms; in failing to call a proper medical consultation in response to BROWN's complaints; in negligently allowing BROWN to pass away; in failing to recognize the significance of BROWN's complaints; in exhibiting poor technique during examinations and failing to treat BROWN in a skillful and proper manner resulting in the failure to diagnose BROWN's condition.

94) The acts and omissions of the Defendants was so persistent and widespread as to constitute policies, customs, and/or practices that proximately caused the constitutional injuries and all injuries to BROWN.

95) All Defendants herein were acting under color of state law and/or performing governmental functions and thus are subject to claims pursuant to 42 U.S.C. § 1983 relating to the adequacy of the medical and health services provided to BROWN.

96) As recently as May 2015, NCSD spokesman, Captain Michael Golio, in response to an inquiry, publicly stated that there is no intention of discontinuing the existing relationship with Armor.

## FIRST CAUSE OF ACTION

97) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

98) At all material times, Defendants, their employees and/or agents, were acting under color of state law, within the scope of their employment and/or their agency relationship with the County, and in concert with one another. These Defendants intentionally, outrageously, and recklessly disregarded BROWN's rights under the United States and New York State Constitutions.

99) Defendants acted with an evil motive and intent, reckless disregard, and callous indifference to BROWN's federally protected rights.

100) Defendants are liable under 42 U.S.C. § 1983 for all of the aforementioned reckless, outrageous, willful, wanton, malicious, and/or intentional acts and omissions, practices and policies of Defendants, while committed under color of state law, which resulted in the deprivation of BROWN's federal constitutional rights, including, but not limited to:

a. BROWN's right to equal protection, enjoyment of civil and/or political rights, and right to be free from discrimination because of sex, race, age, disability, sexual orientation, religion, and any other protected class, in violation of the Fourteenth Amendment to the United States Constitution,

b. BROWN's right to due process and fair and just treatment in violation of the procedural component of the Fourteenth Amendment to the United States Constitution,

c. BROWN's right to beneficial and full use and enjoyment of his property in violation of the Fifth and Fourteenth Amendments to the United States Constitution,

d. BROWN's right to be free from arbitrary and unreasonable government action that deprives him of his rights in violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution and other laws, and

e. BROWN's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution and other laws

101) Defendants' acts and omissions, acting under color of state law, were deliberately indifferent to the conduct of their individual employees and/or agents herein and such indifference was a proximate cause of such unconstitutional conduct and BROWN's injuries.

102) Defendants' acts and omissions, under color of state law, by their own custom, policy, and/or practice of failing to properly screen and/or hire, train, evaluate, supervise, investigate, review and/or discipline their employees and/or agents, including all "JOHN DOE" and "JANE DOE" Defendants, were a proximate cause of the unconstitutional conduct herein alleged.

103) As a direct and proximate result of these policies, practices, and customs, BROWN was deprived of rights protected by the federal constitution as described above, including, but not limited to:

a. BROWN's right to equal protection, enjoyment of civil and/or political rights, and right to be free from discrimination because of sex, race, age, disability, sexual orientation, religion, and any other protected class, in violation of the Fourteenth Amendment to the United States Constitution,

b. BROWN's right to due process and fair and just treatment in violation of the procedural component of the Fourteenth Amendment to the United States Constitution,

c. BROWN's right to beneficial and full use and enjoyment of his property in violation of the Fifth and Fourteenth Amendments to the United States Constitution,

d. BROWN's right to be free from arbitrary and unreasonable government action that deprives him of his rights in violation of the substantive due process clause of the Fourteenth Amendment to the United States Constitution and other laws, and

e. BROWN's right to be free from cruel and unusual punishment under the Eighth Amendment of the United States Constitution and other laws

104) As a direct and proximate result of Defendants' conduct and constitutional violations, Plaintiffs have suffered, conscious pain and suffering, injury and damages, past, present, and future, as set forth in the above and in the common allegations of this Complaint.

## SECOND CAUSE OF ACTION

105) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

106) That the Plaintiff Decedent BROWN died on Februray 10, 2014 as a result of the constitutional violations, medical malpractice, carelessness, recklessness, unskillfulness, and negligence of Defendants and/or their employees, without any act, omission to act, or negligent act on the part of the decedent contributing thereto.

107) That by virtue of his wrongful death, the estate of the decedent has been damaged in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction herein.

108) That Plaintiff is entitled to recovery for decedent's wrongful death pursuant to the New York Estate Powers and Trust Law §§ 5-4.1 and 5-4.3

## THIRD CAUSE OF ACTION

109) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

110) That at all times hereinafter mentioned, Plaintiff MARCELLA BROWN was the mother of the Plaintiff Decedent KEVIN C. BROWN and as such was entitled to the society, services and consortium of her son KEVIN C. BROWN.

111) That by reason of the foregoing, Plaintiff MARCELLA BROWN was deprived of the society, services and consortium of the Plaintiff Decedent KEVIN C. BROWN and shall forever be deprived of said society, services and consortium.

**FOURTH CAUSE ACTION**

(Violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq.,)

112) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

113) BROWN was in the care, custody, control, supervision, and medical care of Defendants, and as such was a prisoner of NCCC.

114) BROWN suffered from a disability as that term is defined by the Americans with Disabilities Act, and as such was a qualified individual with a disability.

115) BROWN was discriminated against in violation of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), and by Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131, et seq., and suffered injury as a direct causal result thereof.

**FIFTH CAUSE OF ACTION**

116) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

117) That prior to, after and on February 10, 2014, BROWN was an incarcerated prisoner at NCCC, and under the care, custody, supervision, and medical care, custody and supervision of Defendants, including Armor.

118) That prior to and on February 10, 2014, BROWN was caused to sustain serious injuries.

119) The above mentioned occurrence, and the results thereof, were caused by the joint, several and concurrent negligence of the Defendants and/or said Defendants' servants, agents, employees and/or licensees in the delivery of medical care, treatment, services, aid, assistance, guidance and supervision rendered to BROWN in that same care was rendered

negligently, and not in accordance with accepted standards of medical care, treatment and services in the community, and was otherwise negligent in the aid, assistance, training, supervision and guidance.

120) The above medical care, diagnosis, treatment, services, aid, assistance, guidance and supervision rendered to BROWN was rendered negligently, and not in accordance with accepted standards of medical care, treatment and services in the community, and was otherwise negligent in the aid, assistance, training, supervision and guidance.

121) The Defendants were negligent in its hiring, training and supervising medical personnel and other non-medical staff who were negligent, and who did not possess the requisite knowledge and skill of similar employees employed in similar facilities.

122) That no negligence on the part of BROWN contributed to the occurrence alleged herein in any manner whatsoever.

123) That as a result of the foregoing, BROWN was caused to sustain serious injuries and to have suffered conscious pain and suffering, pain, shock, mental anguish; that these injuries and their effects will be permanent; as they resulted in BROWN's death.

124) By reason of the negligence and malpractice of Defendants their agents, servants and/or employees in, among other things, the breach of the aforesaid duties and in the failure to properly diagnose, treat, care and manage, BROWN, sustained severe, serious and personal injuries and, ultimately, his death.

125) By reason of the foregoing, MARCELLA BROWN, Individually, and as Proposed Administratrix of The Estate of KEVIN C. BROWN, Deceased have been damaged in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction herein.

## SIXTH CAUSE OF ACTION

126) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

127) At all times relevant Defendants had a duty to properly supervise their employees, subsidiaries, agencies, and/or agents.

128) At all times herein mentioned, Defendants failed to properly supervise their employees.

129) At all relevant times, Defendants, their agents, servants and/or employees, jointly and severally, individually or in concert, disregarded their duty and conducted themselves in a negligent, reckless, careless and unlawful manner, in failing to provide adequate and sufficient medical care to BROWN; in failing to properly train employees; in failing to properly train employees in sufficient numbers; in having employees who were improperly trained or supervised and in otherwise being negligent, reckless, and/or deliberately indifferent in violation of the United States and New York State Constitutions.

130) As a result of the foregoing, BROWN has been damaged in an amount which exceeds the jurisdictional limits of all lower courts which would otherwise have jurisdiction herein.

## SEVENTH CAUSE OF ACTION

131) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

132) The foregoing conduct, acts, omissions, policies, customs, and practices, as set forth in detail herein, undertaken with such callousness, recklessness, deliberate indifference, wanton willfulness, and utter disregard for human sensitivities and rights, constitutes extreme

and outrageous conduct that is so egregious as to exceed the bounds of civilized behavior and shocks the conscience.

133) The foregoing was substantially certain to cause, and did cause, the Plaintiff herein to suffer extreme and enduring conscious pain and suffering, mental anguish, shock, degradation, and enduring physical pain, which was and is the direct result of Defendants' intentional infliction of emotional distress.

## EIGHTH CAUSE OF ACTION

134) Plaintiff hereby repeats, reiterates, and realleges each and every allegation set forth in each and every paragraph above as though fully set forth at length herein.

135) That at all relevant times herein, including the date of BROWN's death, February 10, 2014, through November 2015, Defendants failed to advise MARCELLA BROWN and family of the issues surrounding BROWN's death, including but not limited to, the known history of negligence and inadequate care rendered to inmates of NCCC by Armor, the known history of investigations and reports by numerous governmental agencies with positive findings against the inadequate medical treatment of inmates at NCCC in the past, the actual knowledge of an investigation into the cause of BROWN's death, and the actual knowledge of the agency's findings of inadequate medical care, treatment and supervision rendered to BROWN.

136) That prior to November 2015, MARCELLA BROWN was never given any reason to believe that any untoward circumstances occurred surrounding BROWN's death.

137) That Defendants' failure to inform MARCELLA BROWN of the untoward circumstances surrounding BROWN death constituted a material false representation of fact and/or a lie of omission.

138) That Defendants knew and/or should have known that the failure to inform MARCELLA BROWN of the aforementioned issues surrounding BROWN's death constituted a material false representation of fact.

139) That by failing to inform MARCELLA BROWN of the untoward circumstances surrounding BROWN's death, Defendants knew or should have known that the same was an attempt to conceal from the MARCELLA BROWN Defendants' negligent conduct herein.

140) That Defendants' false misrepresentation of fact and/or concealment of their negligent failures herein amounted to fraud.

141) That the MARCELLA BROWN justifiably relied on the Defendants' lie of omission in believing that no untoward circumstances occurred surrounding BROWN's death.

142) That MARCELLA BROWN, Individually, and as Proposed Administratrix of the Estate of KEVIN C. BROWN, Deceased, was injured as a result of the Defendants knowingly making false representations of fact and/or knowingly attempting to conceal from MARCELLA BROWN their negligent failures to act and various violations of law as alleged herein.

143) Plaintiffs demand a trial by jury on each and every issue of fact and damages set forth herein.

WHEREFORE, Plaintiff demand the following relief jointly and severally against all of the Defendants, as follows:

a. Awarding compensatory damages as to all claims for relief, in an amount not less than $10,000,000.00 to be proved at trial;
b. Awarding punitive damages as to all claims for relief, in an amount not less than $10,000,000.00 to be proved at trial;
c. Awarding costs, including reasonable attorneys' fees;

d. Declaring that the findings of the final NYSCOC report relating to the investigation of BROWN's death are valid and that the said findings be held to be binding upon the Defendants;

e. Directing the Defendants to follow the recommendations of the NYSCOC as set forth in its final report relating to its investigation of BROWN's death;

f. Awarding such other relief as this Court may deem just and proper.

Dated: Garden City, New York
1-6-16

Yours, etc.

JOSEPH G. DELL (JD-7315)
DELL & DEAN, PLLC
Attorneys for Plaintiffs
1225 Franklin Avenue, Suite 450
Garden City, New York 11530
(516) 880-9700